**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

ELENA A. NUNEZ,

Plaintiff

v.

CAROLYN W. COLVIN,
Acting Commissioner of Social Security

Defendant.

**REPORT**
**AND**
**RECOMMENDATION**

**15 Civ. 4957 (CS)(PED)**

---

**TO:   THE HONORABLE CATHY SEIBEL, United States District Judge:**

### I.    INTRODUCTION

Plaintiff Elena A. Nunez ("Plaintiff" or "Claimant,") brings this action pursuant to 42

U.S.C. § 405(g) challenging the Commissioner of Social Security's (the "Commissioner" or

"Defendant") denial of Plaintiff's application for disability insurance benefits. Dkt. 18 at 1. The

matter is before me pursuant to an Order of Reference entered September 24, 2015. Dkt. 12.

Presently before this Court are the parties' cross-motions for judgment on the pleadings pursuant

to Rule 12(c) of the Federal Rules of Civil Procedure, Dkts. 18 (Plaintiff's motion), 19

(Plaintiff's memorandum of law in support ("Pl. Br.")), 21 (Defendant's cross-motion), and 22

(Defendant's memorandum of law in opposition ("Def. Opp.")). For the reasons set forth below,

I respectfully recommend that Defendant's motion be **GRANTED**, and that Plaintiff's motion be

**DENIED**.

### II.   BACKGROUND

The following facts are taken from the Administrative Record ("R.") of the Social

Security Administration, Dkt. 16, filed by Defendant in conjunction with her Answer to the

Complaint. Dkt. 15.

### A. Application History

On October 22, 2012, Plaintiff filed an application for Title XVI Supplemental Security

Income ("SSI") alleging she was disabled beginning in June 29, 2010.[1]  R. 16.  Plaintiff's

application was denied.  R. 120.  She requested a hearing before an Administrative Law Judge

("ALJ"), which was held on February 25, 2014 before ALJ Jerome Hornblass.  R. 16, 30-39.  On

April 25, 2014, the ALJ issued a decision finding that Plaintiff was not disabled.  R. 16-26.

Plaintiff filed an appeal of the decision to the Appeals Council.  R. 1-9.  The ALJ's decision

became final when the Appeals Council denied her request for review on May 14, 2015.  R. 5,

10-15.  Plaintiff timely filed this action on June 25, 2015.  Dkt. 1.

Plaintiff was born on September 24, 1967 in Santo Domingo, Dominican Republic.  R.

25, 33.  She is a naturalized U.S. citizen and has been in the United States at all times since

September 22, 2012.  R. 120.  She was 45 years old when she filed for SSI on October 22, 2012.

R. 16.  She graduated from high school outside of the United States and worked in a factory from

1991-1992 and as a food preparer at a restaurant in 1999.  R. 149-50, 201.  Plaintiff alleges that

she stopped working because she could not find childcare for her children.  R. 149.  At the time

of filing, her son was twenty-one years old and her daughter was eleven years old.  R. 32-33,

201.  She cooks, shops twice a week, cleans twice a month, and does laundry once a month.  R.

203, 206.  Her daughter helps with the household chores.  *Id.*  She testified that her sister always

accompanies her when she travels because she suffers from dizziness.  R. 38-39.  Depending on

---

[1]       For purposes of this action, Plaintiff has elected to treat October 22, 2012 as the
Alleged Onset Date ("AOD") "because the earliest month that SSI benefits may be paid is the
month following the month in which the application for such benefits was filed."  Plaintiff's
Motion for Judgment on the Pleadings (Dkt. 18) at 1 (citing 20 C.F.R. § 416.335).

how Plaintiff is feeling, she socializes with others, watches TV or goes to appointments.  R. 203, 206.

## B. Medical History

The administrative record contains various medical treatment records.  The following is a distillation of their relevant points.

### 1. Diabetes and Peripheral Neuropathy

Plaintiff was diagnosed with diabetes in 2009.  R. 226.  She does not take her insulin regularly nor does she monitor her glucose, diet or exercise regularly.  R. 193, 229, 274, 282.  As a result, she suffers from intermittent problems with her feet and fingers.  R. 233-34, 237.  Her glucose is often high, with hemoglobin A1C[2] ranging from 9.2% to 11%.  R. 239, 240, 250.  According to the American Diabetes Association ("ADA"), hemoglobin A1C over 6.5% is consistent with a diagnosis of diabetes.  R. 239-40.

#### a. Before the Relevant Period

In June 2011, Plaintiff had x-rays to determine the cause of foot pain.  R. 187.  The x-ray showed "[n]o acute bony or articular abnormality," nor any facture, or soft tissue swelling.  R. 187.  There was some indication that her left foot had a small heel osteophyte[3] and a small ossicle in the fifth toe.  R. 187.

---

[2]    The A1C test is a blood test that provides information about a person's average levels of blood glucose, also called blood sugar, over the past 3 months.  The A1C test is sometimes called the hemoglobin A1C, HbA1c, or glycohemoglobin test.  The A1C test is the primary test used for diabetes management and diabetes research.  National Institute of Diabetes and Digestive Kidney Diseases.  Available at https://www.niddk.nih.gov/health-information/diabetes/overview/tests-diagnosis/a1c-test.

[3]    Osteophytes are smooth, bony growths that form over a long period of time.  They are also called bone spurs.  Cedars-Sinai, Conditions & Treatments.  Available at https://www.cedars-sinai.edu/Patients/Health-Conditions/Bone-Spurs-Osteophytes.aspx.

In January 2012, Dr. William Jacobs of the AIM Metabolism Podiatry Clinic reported

Plaintiff suffered from heel pain, which improved with physical therapy, plantar fissured skin,

but showed no signs of pedal infection.  R. 226-27.  On January 20, 2012, Dr. Jacobs noted

Plaintiff's history of GERD,[4] affective disorder,[5] incontinence, hypertension,[6]

hypercholesterolemia,[7] diabetes,[8] and peripheral neuropathy.[9]  R. 226-27.  At that time, Plaintiff

---

[4]     Gastroesophageal reflux disease ("GERD") is a chronic digestive disease.  GERD occurs when stomach acid or, occasionally, stomach content, flows back into your food pipe (esophagus).  The backwash (reflux) irritates the lining of your esophagus and causes GERD. Mayo Clinic, Diseases and Conditions (July 31, 2014).  Available at http://www.mayoclinic.org/diseases-conditions/gerd/basics/definition/con-20025201.

[5]     Affective disorders are a set of psychiatric diseases, also called mood disorders. The main types of affective disorders are depression, bipolar disorder, and anxiety disorder. Healthline, Affective Disorders (Oct. 14, 2016).  Available at http://www.healthline.com/health/affective-disorders.

[6]     Hypertension is high blood pressure.  This is a common condition in which the long-term force of the blood against artery walls is high enough that it may cause health problems, such as heart disease.  Mayo Clinic, Diseases and Conditions (Sept. 9, 2016). Available at http://www.mayoclinic.org/diseases-conditions/high-blood-pressure/basics/definition/con-20019580.

[7]     Hypercholesterolemia is a condition characterized by very high levels of cholesterol in the blood.  Cholesterol is a waxy, fat-like substance that is produced in the body and obtained from foods that come from animals (particularly egg yolks, meat, poultry, fish, and dairy products).  The body needs this substance to build cell membranes, make certain hormones, and produce compounds that aid in fat digestion.  Too much cholesterol, however, increases a person's risk of developing heart disease.  U.S. National Library of Medicine, Genetics Home Reference (Jan. 17, 2017).  Available at https://ghr.nlm.nih.gov/condition/hypercholesterolemia.

[8]     Diabetes is a disease in which the body's ability to produce or respond to the hormone insulin is impaired, resulting in abnormal metabolism of carbohydrates and elevated levels of glucose in the blood and urine.  Mayo Clinic, Diseases and Conditions (July 31, 2014). Available at http://www.mayoclinic.org/diseases-conditions/diabetes/basics/definition/con-20033091.

[9]     Peripheral neuropathy is a condition that develops as a result of damage to the peripheral nervous system — the communications network that transmits information between the central nervous system (the brain and spinal cord) and every other part of the body. Neuropathy means nerve disease or damage.  Symptoms can range from numbness or tingling, to pricking sensations (paresthesia), or muscle weakness.  Areas of the body may become abnormally sensitive leading to an exaggeratedly intense or distorted experience of touch

reported feeling "well," but her blood sugars were high. R. 229. On February 29, 2012, Dr.

Nicholas Fiebach, M.D., of Columbia Presbyterian Medical Center ("CPMC") noted that her

"[f]oot symptoms improved with increased gabapentin," but her diabetes was "[n]ot well

controlled." R. 231. On May 29, 2012, Dr. Fiebach noted that she was "[g]enerally doing well,"

but "acknowledge[d] sometimes (? often) forgetting to take evening insulin." R. 233-34. She

had a fingertip infection that was improving and a non-tender nodule[10] that was "healed

overlying small ulcer w/o erythema[11] or fluctuance." *Id.* In June 2012, she had "pain and

swelling" on her finger with "[r]edness and swelling around nail bed," and was diagnosed with

paronychia and treated with topical medication. R. 235-37.

On September 25, 2012, Plaintiff complained of an eight out of ten pain in her right foot

and calf. R. 247-48. By then, the "[i]nfected fingertip [was] resolved" and she was "[g]enerally

doing well, except that burning discomfort [in] both soles [was] worse, now also has aching

discomfort dorsal arch and anterior ankle on right." R. 249. Dr. Fiebach's physical examination

of Plaintiff showed "[b]oth feet warm, no deformity, non-tender, FROM [full range of motion],

---

(allodynia). In such cases, pain may occur in response to a stimulus that does not normally
provoke pain. Severe symptoms may include burning pain (especially at night), muscle wasting,
paralysis, or organ or gland dysfunction. Damage to nerves that supply internal organs may
impair digestion, sweating, sexual function, and urination. In the most extreme cases, breathing
may become difficult, or organ failure may occur. National Institute of Neurological Disorders,
Peripheral Neuropathy Fact Sheet. Available at https://www.ninds.nih.gov/Disorders/Patient-
Caregiver-Education/Fact-Sheets/Peripheral-Neuropathy-Fact-Sheet.

[10]     A nodule is a growth of abnormal tissue. Nodules can develop just below the
skin. They can also develop in deeper skin tissues or internal organs. The thyroid gland and
lymph nodes may develop nodules as well. Healthline, Symptom Checker (June 8, 2016).
Available at http://www.healthline.com/symptom/skin-nodule.

[11]     Erythema is a skin condition characterized by redness or rash. It is usually caused
by a reaction to medications, infections (especially herpes simplex virus), or illness. University
of Maryland Medical Center, Health Information Medical Reference Guide Complementary and
Alternative Medicine Guide Condition (Aug. 5, 2015). Available at
http://umm.edu/health/medical/altmed/condition/erythema.

and [and] pedal pulses full and symmetric," but the "distal sensation to standard monofilament [was] decreased." R. 250-51. Dr. Fiebach assessed her foot symptoms as "likely distal sensory neuropathy (and perhaps biomechanical strain on right)" and increased her gabapentin. *Id.* At that time, Dr. Fiebach found that Plaintiff's diabetes was still "[n]ot well controlled … perhaps related to omission of second daily dose of insulin intermittently." *Id.*

### b. During the Relevant Period

On November 1, 2012, Dr. Fiebach reported that Plaintiff had "several serious health problems, including major depression and diabetes with complications include peripheral neuropathy and requiring twice daily insulin injections" and opined that she was "partially disabled." R. 189, 200. By November 2012, Plaintiff's "[d]istal sensory neuropathy" had "[i]mproved on increased gabapentin," and she reported no pain. R. 254-56. In December 2012, she complained of "constant fatigue and polyphagia" and reported that "she takes her insulin" but "is not doing much exercise since she is tired all the time." R. 263. Her insulin was increased, and she was encouraged to exercise and walk thirty minutes per day. R. 265. In January 2013, Plaintiff's medical records noted she did "not follow a DM diet (toast, coffee for bfast, chicken/meat with rice for dinner)" and "[s]nacks frequently at bedtime due to anxiety and often times has FS in 400s in the middle of the night." R. 268. Plaintiff checked her blood sugar in the morning regularly, but "does not check at any other times with any regularity." *Id.*

In February 2013, Plaintiff reported no pain and that she was "[g]enerally well." R. 270. Dr. Fiebach noted that Plaintiff "[c]ontinues improved [sic] on increased gabapentin." R. 270-74. She had "[c]ontinued poor control" over diabetes "in context of progressive weight gain," and "[a]dherence to rx and diet [is] uncertain, as is her capacity to adhere." R. 274. The clinic found that "[a]dherence and self-management of chronic diseases" was the "[c]ommon thread in

managing her diabetes, hypertension, hyperlipidemia." R. 274. Additionally, "her psychosocial and family situations are stressful and challenge her capacity to manage her own health issues." *Id.*

### 2. Obesity

#### a. During the Relevant Period

On January 31, 2012, Plaintiff presented for readmission to the diabetes clinic. It was noted that changing Plaintiff's diet and eating healthier "will make the biggest impact in her DM care." R. 268. On February 7, 2012, Plaintiff's Body Mass Index ("BMI")[12] was 36.6. R. 270. Dr. Fiebach noted that Plaintiff had unintentional weight change and an abnormal BMI. R. 275. On September 25, 2012, Plaintiff's BMI was 35.6. R. 248.

In December 19, 2012, Plaintiff's BMI increased to 36.7. R. 262. At a follow-up for her uncontrolled diabetes, Plaintiff reported constant fatigue and polyphagia[13] and that she "understood the importance of loosing [sic] wt." R. 262-66. On February 22, 2013, Plaintiff was referred to "nutrition for better diet control." R. 277-78. On March 7, 2013, Plaintiff's BMI

---

[12]   SSR § 02-1p defines obesity as follows:

The National Institutes of Health ("NIH") established medical criteria for the diagnosis of obesity in its Clinical Guidelines on the Identification, Evaluation, and Treatment of Overweight and Obesity in Adults (NIH Publication No. 98-4083, September 1998). These guidelines classify overweight and obesity in adults according to BMI. BMI is the ratio of an individual's weight in kilograms to the square of his or her height in meters (kg/m2). For adults, both men and women, the Clinical Guidelines describe a BMI of 25-29.9 at "overweight" and a BMI of 30.0 or above as "obesity."

The Clinical Guidelines recognize three levels of obesity. Level I includes BMIs of 30.0-34.9. Level II includes BMIs of 35.0-39.9. Level III termed "extreme" obesity and representing the greatest risk for developing obesity-related impairments, includes BMIs greater than or equal to 40. These levels describe the extent of the obesity, but do not correlate with any specific degree of functional loss.

[13]   Polyphagia is a medical term used to describe excessive hunger or increased appetite. *Polyphagia*, Attorney's Dictionary of Medicine (2016).

rose again to 38.3.  R. 283.  Plaintiff's case manager noted that Plaintiff had pervasively poor

control over her diabetes and progressive weight gain from her diabetes.  R. 279-82.  On May 9,

2013, Plaintiff's BMI was 38.1.  R. 283.  Medical staff provided extensive counseling to Plaintiff

about the harms of eating a second dinner and the consequences on Plaintiff's diabetes and

anxiety/affective disorder.  R. 283-288.  On June 4, 2013, Dr. Fiebach noted that Plaintiff's

diabetes was poorly controlled and that Plaintiff continued to eat a second dinner.  R. 291.

### 3.  Depression and Anxiety

#### a.  Before the Relevant Period

Plaintiff reported suffering from depression and anxiety her entire life.  She said she

received treatment for about a year and a half in the mid-2000s, R. 299, 325, and began treatment

at the Metropolitan Center for Mental Health on July 19, 2011.  R. 325.  At an intake assessment,

she "appeared a bit teary at times," and "very anxious and somewhat guarded."  R. 325.  She

"indicated that at times she wished she were dead out of loneliness" but "[n]o suicidal ideation

was present."  *Id.*  She reported feelings of emptiness, sadness, irritability, low libido, anxiety,

depression, and eating "out of anxiety and at times is unable to sleep."  *Id.*  On August 15, 2011,

Plaintiff expressed to Dr. Nina Urban of CPMC that she suffered from lifelong depression and

anxiety that had worsened in the past few years.  R. 299.  Dr. Urban diagnosed Plaintiff with

Major Depressive Disorder.  R. 299-301.  Her symptoms were insomnia, "some decrease in

concentration and memory," tearfulness, significant anxiety with overeating, intermittent passive

suicidal ideations without intent or plan, a prominent feeling of emptiness and loneliness, and

feeling very sad, anxious, and stressed.  R. 299, 324, 383.  However, Plaintiff was well-groomed,

well related, and mostly euthymic,[14] with fluent speech, stable affect, intact cognition, fair

insight and judgment, coherent thought process, with no psychomotor retardation or agitation.

R. 300-01. Dr. Urban diagnosed her with major depressive disorder with a Global Assessment of

Functioning ("GAF")[15] score of 40/50. *Id.*

In September 2011, Plaintiff reported "feeling mildly better on antidepressants" and that

her mood was "better but not good," but she was "more anxious, tense, w[ith] frequent crying

spells. R. 323. Dr. Urban observed that Plaintiff "appear[ed] calmer in general (i.e. less

unstable/dysphoric)," her affect was "initially bright, but quickly becomes severely tearful." *Id.*

In October 2011, her mood had improved with a higher dose of antidepressants. R. 322. She

had good eye contact and linear thought process, but restricted affect, poor sleep, thoughts of not

wanting to live, and fatigue. R. 322. In November 2011, she had improvement in her symptoms

and was "sleeping better," but still had "occasional days of melancholy and anxiety." R. 321.

She was well-groomed and had spontaneous speech, coherent thought process, euthymic mood,

and an affect that was full, stable, and pleasant, but mildly anxious. *Id.* In January 20, 2012, Dr.

Jacobs reported Plaintiff's personal history of affective disorder since October 20, 2009. R. 226.

---

[14]    Euthymia is a normal non-depressed, reasonably positive mood. It is
distinguished from hyperthymia, which refers to an extremely happy mood, and dysthymia,
which refers to a depressed mood. *Euthymia*, Medical Dictionary, the Free Dictionary.
Available at http://medical-dictionary.thefreedictionary.com/euthymic.

[15]    GAF is found at Axis V of the multiaxial system used by mental health
professionals. It is a rating of the individual's overall level "psychological, social, and
occupational functioning on a hypothetical continuum of mental health-illness" intended to plan
treatment, measure its impact, and predict outcomes. GAF refers to the individual's overall level
of functioning and is assessed by using the GAF scale, which provides ratings in ten ranges from
1-100 with higher scores reflecting greater functioning. A GAF of 51-60 represents moderate
symptoms (e.g., flat affect and circumstantial speech, occasional panic attack) or moderate
difficulty in social, occupational, or school functioning. *See American Psychiatric Association*,
Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") (4th ed. text rev. 2000) at
32-35.

On January 23, 2012, Dr. Urban reported that Plaintiff was "feeling more depressed" for three days because of "more stress at home." R. 319.  She said trazadone did not "help at all for sleep," but she took Ativan once or twice a week with "good effect." *Id.*  Plaintiff reported no other complaints. *Id.*  In February 2012, Dr. Fiebach noted her affective disorder was "[s]table, compensated with ongoing psychiatric treatment." R. 231.  In March 2012, Dr. Urban reported that Plaintiff was "generally doing better" but "still has intermittent anxiety but approximately only on a few days per week and trouble concentrating." R. 317.  In June 2012, Plaintiff had been "doing well" and her "symptoms of depression are better." R. 315.  On August 20, 2012, she reported "feeling overwhelmed w/financial stress which she feels is contributing to anxiety + low mood." R. 313.  She was fairly groomed, cooperative, and well-related and had an affect in the fair range, coherent thought process, and no psychomotor retardation. R. 313.  In October 2012, Plaintiff said she was "doing ok." R. 312.

### b.  During the Relevant Period

On November 9, 2012, a social worker noted Plaintiff "appeared a bit disorganized and became tearful easily." R. 191.  Around the same time, Dr. Fiebach noted that Plaintiff's "recent disorganization is worrisome." R. 256.  On November 26, 2012, Plaintiff told Dr. Urban she was "overall feeling better" with "no acute complaints other than feeling more anxious over her recent application for disability as she is ambivalent about it." R. 311.  She found "Ativan helpful, but not long lasting enough." *Id.*  Dr. Urban observed that she had "mildly pressured speech and anxious affect when discussing SSD application, but overall euthymic" with "stable affect" and "spontaneous speech." *Id.*

Plaintiff missed her appointment with Dr. Urban in January 2013, and in February 2013, she met with Dr. Evan Leibu who noted Plaintiff's worsening mood, energy, and anhedonia[16] and "continual difficulties [with] her disability application and subsequent financial difficulties." R. 309-10. She was concerned about weight gain with medication changes and reported increased appetite. *Id.* She was well dressed, her thought process was goal directed, and her judgment was fair. R. 309. Dr. Leibu prescribed Plaintiff Wellbutrin to address her symptoms. R. 309. On March 25, 2013, Plaintiff's Wellbutrin prescription was increased because her depressive state was exacerbated and her previous dosage had not adequately addressed her symptoms. R. 308. Upon examination, Plaintiff reported an improvement in her mood, "feeling better," and had no acute complaints. R. 307. Dr. Urban found that Plaintiff exhibited an anxious effect and rambling speech, a depressive mood, low self-esteem, low level of functioning, and anxiety. R. 308. At this time, Dr. Urban assessed Plaintiff's GAF score to be at 54. R. 329. On May 15, 2013, Dr. Urban noted under Plaintiff's "Discharge Criteria" that she "needed to increase her level of functioning." R. 334. In June 2013, Dr. Fiebach observed that Plaintiff had "[n]ormal affect" and "seems to be coping better with family stressors." R. 291. On July 17, 2013, Dr. Urban reported that Plaintiff was feeling overall better since her medications were increased, but still occasionally felt sad, was mildly tearful at times, and was not sleeping well. R. 305. Dr. Urban increased Plaintiff's Ambien prescription. R. 305.

## C. Medical Source Statements and Consultative Examinations

### 1. Treating Psychiatrist, Dr. Nina Urban

Dr. Nina Urban completed two medical source statements, first in February 2013, and

---

[16]    Anhedonia is a marked decrease in the pleasure of living or of being alive; a loss of appreciation for activities which are normally pleasurable; the loss of emotional well-being; the inability to be happy, no matter what. *Anhedonia*, Attorney's Dictionary of Medicine (2016).

then in February 2014. R. 220, 389.  In both of Dr. Urban's Medical Source Statements, Dr.

Urban reported that Plaintiff was diagnosed with Major Depressive Disorder, suffered from

generalized persistent anxiety and that Plaintiff would have marked or extreme limitations in

understanding and remembering detailed instructions, maintaining attention and concentration

for extended periods, and working in coordination with others without being unduly distracted.

R. 214-218 (2013 Medical Source Statement), 385-389 (2014 Medical Source Statement).  In her

February 20, 2013 medical source statement, Dr. Urban identified her treating diagnoses as

major depressive disorder and generalized anxiety disorder and assessed Plaintiff's GAF at 54.

R. 214-20.  Dr. Urban noted that she prescribed Celexa, Wellbutrin, Ambien, and Klonopin to

treat Plaintiff, who reported no side effects.  R. 221.   Dr. Urban reported that Plaintiff suffered

from: poor memory, appetite disturbance with weight change, sleep disturbance, emotional

lability,[17] anhedonia, psychomotor agitation or retardation, feelings of guilt/worthlessness,

difficulty thinking or concentrating, social withdrawal or isolation, decreased energy, intrusive

recollections of traumatic experience, persistent irrational fears generalized persistent anxiety,

and pathological dependence or passivity. R. 220.  When asked to describe the clinical findings

that demonstrated the severity of Plaintiff's mental impairment and symptoms, Dr. Urban

referred only to the "intake psychiatric evaluation." R. 221.

Dr. Urban opined that Plaintiff has either extreme or marked loss in seventeen work-

related areas. R. 222-24.  In particular, Dr. Urban opined that Plaintiff would have marked

limitations in activities of daily living, marked difficulties in maintaining social functioning,

---

[17]      In psychiatry, lability refers to emotional instability or rapidly changing emotions.
Healthtalk.org, Motor Neurone Disease.  HealthTalk.Org, People's Experiences, Nerves & brain
(Sept. 2014).  Available at http://www.healthtalk.org/peoples-experiences/nerves-brain/motor-
neurone-disease-mnd/emotional-lability-depression-and-low-mood.

constant deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner (in work settings or elsewhere), and continual episodes of deterioration or decompensation in work or work-like settings, which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms, which may include deterioration of adaptive behaviors. R. 222-23. She opined that Plaintiff had (1) extreme loss in her ability to remember locations and procedures, understand, remember, and carry out detailed instructions, maintain attention and concentration, deal with the stress of semi-skilled and skilled work, perform at a consistent pace, make simple decisions, respond to changes in a routine work setting, and complete a normal workday or week, (2) marked loss in her ability to sustain ordinary routine, accept instructions and criticism, maintain regular attendance and be punctual, work in coordination with or proximity to others, and be aware of hazards, and (3) moderate loss in her ability to understand, remember, and carry out very short, simple instructions, get along with others, interact with the public, maintain socially appropriate behavior, adhere to basic standards of neatness, travel in unfamiliar places, and use public transportation. *Id.* Dr. Urban opined these restrictions had been present since 2003, eight years before she began treating Plaintiff. R. 224.

On February 19, 2014, Dr. Urban completed a second, substantially similar medical source statement that again opined that Plaintiff had moderate to extreme limitations in all work-related activities with a GAF score of 54. R. 385-89. Dr. Urban reported that Plaintiff suffered from: poor memory, appetite disturbance with weight change, sleep disturbance, and emotional lability. For clinical findings that reflected the severity of Plaintiff's impairments, Dr. Urban referred to her mental status examinations and the intake examination. R. 386.

13

### 2.   Consultative Psychologist, Dr. Michael Kushner

On December 20, 2012, Dr. Michael Kushner, Ph.D., conducted a psychiatric consultative examination of Plaintiff, who reported symptoms of bone pain, difficulty falling asleep, short-term memory problems, increased appetite, depressive mood, crying spells, a great deal of sadness, and feelings of emptiness and uselessness, but denied any suicidal ideation.  R. 201-204.  Upon examination, Plaintiff's mood was dysthymic,[18] and her affect was depressed. Dr. Kushner found that Plaintiff's recent and remote memory skills were mildly impaired. Plaintiff was only able to recall two out of three items after five minutes, and could not repeat any digits backwards.  *Id.*  Dr. Kushner opined that her intellectual functioning was below average, and her general fund of information was somewhat limited.  R. 203.  Her motor behavior was normal, her eye contact was appropriate, her attention and concentration were intact, and her judgment was good, although her mood was dysthymic, her affect was depressed, and her memory skills were mildly impaired.  R. 202.

Dr. Kushner diagnosed Plaintiff with depressive disorder and opined that she could learn new tasks, follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, and make appropriate decisions.  R. 203-04.  He opined that her "[p]rognosis is fair" and she "may be able to perform complex tasks under supervision," but her "ability to relate adequately with others and appropriately deal with stress may be impaired by psychiatric problems and her psychiatric problems "may significantly interfere with the claimant's ability to function on a daily basis."  R.

---

[18]      Persistent depressive disorder, also called dysthymia, is a continuous long-term (chronic) form of depression.  Mayo Health Clinic, Diseases and Conditions.  Available at http://www.mayoclinic.org/diseases-conditions/persistent-depressive-disorder/home/ovc-20166590.

204.  It was recommended that Plaintiff continue her psychological and psychiatric treatment as currently provided.  R. 201-204.  Plaintiff's medications at the time of this examination included Citalporam, Zolpidem, Lorazepam, Ramipril, Hydrochlorothiazide, Novolog, FlexPen, Metformin, Gabapentin, and Crestor.  R. 201-204.

### 3.  Consultative Internal Medicine Examiner, Dr. Shannon Gearhart

On December 20, 2012, Dr. Shannon Gearhart examined Plaintiff and found that Plaintiff was 58 inches tall and weighed 180 pounds and suffered from diabetes, and neuropathy with numbness in her left.  R. 205-08.  Plaintiff reported bilateral shoulder, bilateral knee, and bilateral foot pain, for which she received physical therapy with minimal relief.  *Id.*  Her pain was exacerbated by moving her arms and was most pronounced with prolonged sitting or walking more than five block at a time.  *Id.*  She denied weakness in her limbs but gets fatigued easily.  *Id.*

Dr. Gearhart opined that Plaintiff has moderate restrictions for: heavy lifting, carrying, squatting, kneeling, climbing, and going up and down stairs.  R. 205-208.  During her physical exam, Plaintiff had a normal gait, and could walk on her heels and toes without difficulty.  R. 206.  She had full range of motion in her ankles, knees, and shoulders, with mild limitations in her lumbar and hip movement and stable joints with no redness, heat, swelling, or effusion, but had tenderness in her shoulders.  R. 207-08.  She had no sensory deficits in her extremities and intact hand and finger dexterity.  R. 207-08.

Dr. Gearhart diagnosed Plaintiff with diabetes, neuropathy, hypertension, foot, knee, and shoulder pain, depression, and anxiety with "moderate restrictions for heavy lifting, carrying, squatting, kneeling, climbing, and going up and down stairs," "mild to moderate restrictions for prolonged walking and standing," and "mild restrictions for prolonged sitting."  Plaintiff's

15

medications at the time of Dr. Gearhart's exam included Citalopram, Zolpidem, Lorazepam, Ramipril, Hydrochlorothiazide, Novolog Flex Pen, Metformin, Gabapentin and Cretor.  R. 205-06.

### D. Plaintiff's Hearing Testimony

On February 25, 2014, Plaintiff testified with the aid of a Spanish interpreter before ALJ Hornblass in New York, New York.  R. 30-39.  She was 46 years old at the time of the hearing.  R. 34.  Plaintiff testified that she was born in Santa Domingo, Dominican Republic.  R. 33-34.  Plaintiff testified that she was living with her children who she supports with food stamps and child support.  R. 32-34.  Plaintiff testified that her daughter helps her get dressed because she cannot do it herself.  R. 33-34.  Similarly, Plaintiff testified that her sister accompanies her whenever she travels.  R. 37.  Plaintiff testified that she takes her insulin twice a day to control her diabetes.  R. 35-36.  Plaintiff testified that on bad days she feels tired, her body aches, and she feels dizzy.  R. 34-36.  Plaintiff testified that she could not work due to these symptoms.  R. 35-36.  On the topic of her physical impairments, Plaintiff testified about her inability to stand for more than ten to fifteen minutes at a time, cramps, itchiness, body aches, dizziness, nausea, pain in her hands and feet, stomach pain, and being "always tired."  R. 35-36.  On the topic of her mental impairments, Plaintiff testified that her depression made her lose focus, feel sad, isolate herself, and cry often.  R. 36-37.  In response to the ALJ's questions about medications, Plaintiff reported that she was experiencing nausea, dizziness, stomach pain, and tiredness as side effects of her medication.  *Id.*

16

### III.   **LEGAL STANDARDS**

#### A. **Standard of Review**

In reviewing a decision of the Commissioner, a district court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).  "It is not the function of a reviewing court to decide de novo whether a claimant was disabled."  *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999).  Rather, the court's review is limited to "determin[ing] whether there is substantial evidence supporting the Commissioner's decision and whether the Commissioner applied the correct legal standard." *Poupore v. Astrue*, 566 F.3d 303, 305 (2d Cir. 2009) (per curiam).

The substantial evidence standard is "even more" deferential than the 'clearly erroneous' standard.  *Brault v. Social Sec. Admin*, 683 F.3d 443, 448 (2d Cir. 2012).  The reviewing court must defer to the Commissioner's factual findings, and the Commissioner's findings of fact are considered conclusive if they are supported by substantial evidence.  *See* 42 U.S.C. § 405(g). "Substantial evidence" is "more than a mere scintilla" and "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Lamay v. Commissioner of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009) (internal quotations omitted) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  "In determining whether the agency's findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."  *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (internal quotations omitted).  "When there are gaps in the administrative record or the ALJ has applied an improper legal standard," or when the ALJ's rationale is unclear in light of the record evidence, remand to the Commissioner

"for further development of the evidence" or for an explanation of the ALJ's reasoning is warranted. *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996).

### B. **Statutory Disability**

A claimant is disabled under the SSA when he or she lacks the ability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).  In addition, a person is eligible for disability benefits under the SSA only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. *Id.* § 423(d)(2)(A).

A claimant's eligibility for SSA disability benefits is evaluated pursuant to a five-step sequential analysis:

1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2. If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

3. If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations.  If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4. If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

18

> 5.   If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Rolon v. Commissioner of Soc. Sec.*, 994 F. Supp. 2d 496, 503 (S.D.N.Y. 2014); *see* 20 C.F.R. §§ 404.1520(a)(4)(i)–(v), 416.920(a)(4)(i)–(v).  The claimant bears the burden of proof as to the first four steps of the process.  *See Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003). If the claimant proves that his impairment prevents him from performing his past work, the burden shifts to the Commissioner at the fifth and final step.  *See id.*  At the fifth step, the Commissioner must prove that the claimant is capable of obtaining substantial gainful employment in the national economy.  *See Butts v. Barnhart*, 416 F.3d 101, 103 (2d Cir. 2005); 20 C.F.R. § 404.1560(c)(2).

### C.   Treating Physician Rule

When considering the record evidence, the ALJ must give deference to the opinions of a claimant's treating physicians.  A treating physician's opinion will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in . . . [the] record."  20 C.F.R. § 416.927(c)(2); *see also Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000).

Before an ALJ can give a treating physician's opinion less than controlling weight, the ALJ should consider the following factors to determine the amount of weight the opinion should be given: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the medical support for the treating physician's opinion, (4) the consistency of the opinion with the record as a whole, (5) the physician's level of specialization in the area, and (6) other factors that tend to support or contradict the opinion. 20 C.F.R. § 416.927(c)(2)-(6); *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993).  Although the foregoing factors guide an ALJ's assessment of a treating physician's

opinion, the ALJ need not expressly address each factor. *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order) ("We require no such slavish recitation of each and every factor where the ALJ's reasoning and adherence to the regulation are clear.")(citing *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (per curiam)). As long as the ALJ provides "good reasons" for the weight accorded to the treating physician's opinion and the ALJ's reasoning is supported by substantial evidence, remand is unwarranted. *See Halloran v. Barnhart*, 362 F.3d 28, 32-33 (2d Cir. 2004).

### D.   Credibility

In determining a claimant's residual functional capacity, the ALJ is required to consider the claimant's reports of pain and other limitations, 20 C.F.R. § 416.929, but is not required to accept the claimant's subjective complaints without question. "It is the function of the [Commissioner], not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983). The ALJ has discretion to weigh the credibility of the claimant's testimony in light of the medical findings and other evidence in the record. *McLaughlin v. Sec'y of Health, Educ. & Welfare*, 612 F.2d 701, 704-05 (2d Cir. 1980). The Social Security Regulation provide a two-step process for the ALJ to follow:

> At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. 20 C.F.R. § 404.1529(b). That requirement stems from the fact that subjective assertions of pain alone cannot ground a finding of disability. 20 C.F.R. § 404.1529(a). If the claimant does suffer from such an impairment, at the second step, the ALJ must consider "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" of record. *Id.* The ALJ must consider "[s]tatements [the claimant] or others make about [his] impairment(s), [his] restrictions, [his] daily activities, [his] efforts to work, or any other relevant

statements [he] make[s] to medical sources during the course of examination or treatment, or to [the agency] during interviews, on applications, in letters, and in testimony in [its] administrative proceedings." 20 C.F.R. § 404.1512(b) (3); 20 C.F.R. § 404.1529(a); Social Sec. Reg. 96-7p.

In addition to this two-step process, the ALJ must explain his decision to reject a Plaintiff's testimony "with sufficient specificity to enable the [reviewing] Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his decision is supported by substantial evidence." *Duran v. Colvin*, No. 14 Civ. 8677, 2016 U.S. Dist. LEXIS 131485, at *38 (S.D.N.Y. Sept. 23, 2016). Ultimately, the ALJ's determination of credibility is entitled to deference. *See Snell v. Apfel*, 177 F.3d 128, 135-36 (2d Cir. 1999) ("After all, the ALJ is in a better position to decide issues of credibility").

### E.   Vocational Expert Testimony

As noted above, it is the Commissioner's burden, to show that, based on the Plaintiff's residual functional capacity, age, education, and work experience, work "exists in significant numbers either in the region where [Plaintiff] lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A). The Commissioner may satisfy this burden by reliance on the expertise of a vocational expert. 20 C.F.R. § 404.1594(f)(8); *Bapp v. Bowen*, 802 F.2d 601, 604-05 (2d. Cir. 1986). The ALJ may also rely on the Grids to make such a determination. However, the ALJ cannot rely on the Grids if a non-exertional impairment has any more than a "negligible" impact on a claimant's ability to perform the full range of work, and instead must obtain the testimony of a vocational expert. *See Zabala v. Astrue*, 595 F.3d 402, 411 (2d Cir. 2010). A nonexertional impairment is non-negligible "when it . . . so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." *Zabala*, 595 F.3d at 411 (internal quotations marks omitted).

## IV.   THE ALJ'S DECISION

The ALJ issued a decision on April 25, 2014, following the standard five-step inquiry for determining disability.  R. 16-16.  In the first step of the inquiry, the ALJ determined that Plaintiff had not performed substantial gainful activity during the relevant period.  R. 18.

At step two, the ALJ next found that Plaintiff's medical issues — diabetes mellitus Type II, peripheral neuropathy, obesity, major depressive disorder, and generalized anxiety disorder — rose to the level of "severe medically determinable physical or mental impairment" causing "more than minimal limitation in the claimant's ability to perform basic work activities."  R. 18.

At step three, further considering the medical severity of Plaintiff's impairments "singly and in combination," the ALJ decided that Plaintiff did not meet or medically equal the "Appendix 1" impairments, which compel a finding of disability.  R. 18-19.

The ALJ also found that the severity of the claimant's mental impairments considered singly and in combination did not meet or medically equal the criteria of listing 12.04 or 12.06. R. 19-20.  Listing 12.04 details the types of affective disorders and level of severity that a claimant must show to prove a mental impairment.  Paragraph B of Listing 12.04 of Appendix 1 to 20 C.F.R. Part 404, Subpart P, requires that the mental impairments "result in at least two of the following: [1] marked restriction of activities of daily living; [2] marked difficulties in maintaining social functioning; [3] marked difficulties in maintaining concentration, persistence, or pace; or [4] repeated episodes of decompensation, each of extended duration."  *Id.*  The ALJ noted that a "marked limitation" is defined as one that is more moderate but less than extreme." R. 19.  Additionally, the phrase "repeated episodes of decompensation, each of extended duration," requires that the claimant have "three episodes within one year, or an average of once every four months, each lasting for at least two weeks."  R. 19.

Paragraph C of Listing 12.04 requires that the claimant show a "[m]edically documented history of a chronic affective disorder of at least two years' duration that has caused more than a minimal limitation of ability to do basic work activities," plus one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

Appendix 1, Listing 12.04(C).

The ALJ found that the evidence did not establish the presence of "paragraph C" criteria because "there is no documentation of repeated episodes of decompensations, predicted decompensation with minimal increase in mental demands or change in environment, or inability to function outside a highly supportive living arrangement." R. 19. In determining whether Plaintiff met the criteria of Paragraph B, the ALJ found that Plaintiff's functional limitations consisted of "mild restrictions in activities of daily living, moderate difficulty maintaining social functioning, and moderate difficulty sustaining concentration, persistence and pace... [and no] more than mild limitations from a psychiatric impairment." R. 19.

Before moving to step four, the ALJ noted that the limitations in Paragraph B are used to rate the "severity of mental impairments at steps 2 and 3 of the sequential evaluation process." R. 19. As the ALJ further observed, the mental residual functional capacity assessment used at steps four and five requires "a more detailed assessment" involving itemization of the "various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments." R. 19.

23

At step four, the ALJ made a finding about Plaintiff's residual functional capacity based on all the relevant medical and other evidence.  The ALJ found that "the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 416.967(b) except that she is restricted to work involving simple repetitive and routine tasks, and no more than occasional interaction with the public.  Subject to these restrictions, the ALJ found that Plaintiff can stand or walk for six of eight hours in a work day, frequently lift and carry objects weighing 10 pounds, occasionally lift and carry up to 20 pounds, push/pull to her lifting/carrying capacity, understand, remember, and carry out simple instructions, make simple work related decisions, respond appropriately to supervisors, co-workers, and usual work situations, and deal with changes in a routine work setting."  R. 20.  In making this determination, the ALJ considered, among other things, Plaintiff's testimony that that she: (1) is always tired, (2) has pain in her hands and feet, (3) is unable to stand for more than 15 minutes, (4) cannot lift objects without pain, and (5) suffers from dizziness, nausea, and stomach pain.  R. 20.  The ALJ also considered Plaintiff's testimony about her depression, anxiety and lack of focus.  R. 20.

The ALJ determined that the "record substantiates that [she] has diabetes mellitus, type II, and peripheral neuropathy," hypertension, hyperlipidemia, and "receives mental health treatment for depressive and anxiety disorders.  However, the medical evidence does not support a finding that any one or more of the claimant's impairments is as functionally limiting as alleged."  R. 20.

In making the residual functional capacity determination, the ALJ gave "significant weight" to the December 2012 opinion of Dr. Gearhart because "it was based on accepted clinical and diagnostic techniques and, moreover, is supported by the essentially normal objective findings obtained during the consultative examination and noted throughout Dr.

Fiebach's treating records." R. 24.  The ALJ gave "limited weight" to "Dr. Fiebach's November 2012 statement that the claimant is "partially disabled" because it is conclusory and does not indicate specific functional limitations.  However, this residual functional capacity and Dr. Gearhart's functional assessment are fully consonant with the objective findings in Dr. Fiebach's treating records." R. 24.  The ALJ gave "substantial weight" to Dr. Kushner's opinion and incorporated his assessed limitations into this residual functional capacity finding. R. 25.  The ALJ noted that although the views of treating physicians who have engaged in the primary treatment of the claimant are entitled to deference, this is only if the treating physician's opinion is well supported and there is no substantial inconsistent evidence in the record.  R. 24 (citing 20 C.F.R. §415.927; Soc. Sec. Reg. 96-2p).

The ALJ found that the severity of the symptoms and limitations in Dr. Urban's February 2013 and February 2014 reports — that the claimant is so functionally limited that her ability to make even simple work-related decisions or perform at a consistent pace without an unreasonable lengthy rest period is extremely limited and she has markedly limited ability to understand remember even short simple instructions or be aware of normal hazards — were contradicted by the GAF scores of 54-55 given by Dr. Urban, and were not borne out by the medical record, including Dr. Urban's own progress notes, which reflect that the claimant had essentially normal objective findings, was often euthymic, and remained stable throughout the period at issues.  R. 25.  As a result of these inconsistencies, the ALJ gave more weight to Dr. Urban's contemporaneous treating notes when Dr. Urban's opinions were inconsistent with her treating notes.  *Id.*

After making the above findings, the ALJ considered whether the claimant would be able to perform any past relevant work and found that the claimant had no past relevant work to

25

consider. R. 25 (citing 20 C.F.R. § 416.965).

In the final step, after considering Plaintiff's residual functional capacity, age, education, and work experience, the ALJ decided that Plaintiff could adjust to other work that exists in significant numbers in the national economy. R. 25-26 (citing 20 C.F.R. §§ 416.969, 416.969(a)). The ALJ found that Plaintiff could make a successful adjustment to some categories of work, such as, "unskilled jobs," which "ordinarily involve dealing primarily with objects rather than with data or people," because although somewhat mentally impaired, she "does not have a substantial loss of ability to perform basic mental tasks associated with unskilled work." R. 26.

Following these conclusions, the ALJ reached the end of the five-step process, determined that Plaintiff was not disabled, and denied her application for benefits. R. 26.

## V.   ASSESSING THE ALJ'S FINDINGS

Plaintiff challenges the ALJ's decision on five grounds: (1) the ALJ erred by failing to properly award controlling weight to the plaintiff's treating psychiatrist's opinions, Pl. Br. at 1-8; (2) the ALJ erred by failing to consider the combination of Plaintiff's mental and physical impairments before making his residual functional capacity determination, Pl. Br. at 9-11; (3) the ALJ erred by failing to give credence to Plaintiff's testimony about the side effects of her medications, Pl. Br. at 11; (4) the ALJ erred by failing to use a vocational expert to determine whether a significant number of jobs exist in the economy for Plaintiff, Pl. Br. at 12-13; and (5) the ALJ erred by finding that Plaintiff can communicate in English. Pl. Br. at 14-15.

Defendant contends that (1) the ALJ properly gave less than controlling weight to Dr. Urban's opinions because they were contradicted by objective medical findings and contrary medical opinions, Def. Opp. at 24; (2) the ALJ properly and explicitly considered the

26

combination of Plaintiff's physical and mental impairments before making his residual functional capacity determination, Def. Opp. at 20-23; (3) the ALJ properly discredited Plaintiff's testimony about the side effects of her medications for being unsupported by the record, Def. Opp. at 19-20; (4) the ALJ was not required to use vocational expert testimony to determine whether a significant number of jobs exist in the economy for Plaintiff because Plaintiff's nonexertional limitations had a negligible impact on the Plaintiff's ability to work in that category of work, Def. Opp. at 24; and (5) the ALJ's error in finding Plaintiff could speak English was harmless. Def. Opp. at 25.

For the reasons that follow, I recommend that the Court grant Defendant's cross-motion for judgment on the pleadings and deny Plaintiff's motion for judgment on the pleadings.

## A.  The ALJ's Residual Functional Capacity Determination

Plaintiff challenges the ALJ's 'step four' conclusions about her residual functional capacity on three grounds: (1) the ALJ erred by failing to properly award controlling weight to the plaintiff's treating psychiatrist's opinions, Pl. Br. at 1-8; (2) the ALJ erred by failing to consider the combination of Plaintiff's mental and physical impairments before making Plaintiff's residual functional capacity determination, Pl. Br. at 9-11; and (3) the ALJ erred by not giving credence to Plaintiff's testimony about the side effects of her medications.  Pl. Br. at 11.

### 1.    The Treating Physician Rule

Plaintiff first claims that the ALJ erred in failing to accord controlling weight to the opinion of Plaintiff's treating psychiatrist, Nina Urban, M.D., and also in failing to specify with precision what weight he did accord to Dr. Urban's opinions.   Pl. Br. at 3-4.  Plaintiff's claim targets the ALJ's determination that, "to the extent Dr. Urban's reports are inconsistent with her treating notes," he would "give more weight to the contemporaneous treating notes."  R. 24-25.

Defendant contends that the ALJ properly addressed the weight of Dr. Urban's opinions by giving "more weight" to the findings in Dr. Urban's treating notes and therefore less weight to Dr. Urban's "assessments of marked and extreme limitations" that were inconsistent with the record and Dr. Urban's treating notes.  Def. Opp. at 18 (quoting R. 24-25).

The treating physician rule ordinarily requires "an ALJ to give 'controlling weight' to the opinion of a treating physician." *Foxman v. Barnhart*, 157 F. App'x 344, 346 (2d Cir. 2005) (summary order) (quoting 20 C.F.R. § 404.1527(d)(2) (citing *Veino v. Barnhart*, 312 F.2d 578, 588 (2d. Cir. 2002)).  "The opinion of the treating physician is not afforded controlling weight," however, where "the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).  The Second Circuit has indicated that, in certain circumstances, "[a]n ALJ is entitled to . . . *disregard the opinion of a treating physician altogether* — but only if the ALJ's decision is based upon proper consideration of the [20 C.F.R. § 404.1527(d)] factors." *Foxman*, 157 F. App'x at 346-47 (emphasis added) (summary order); *Flanigan v. Colvin*, 21 F. Supp. 3d 285, 305 (S.D.N.Y. 2014) ("The ALJ's determination to give no weight to [the treating physician's] *ipse dixit* after the fact opinion was not erroneous.").  In order for an ALJ to decide whether to award a treating physician's opinion controlling weight, the regulations require that an ALJ consider:

> the frequency of examination and the length, nature, and extent of the treatment relationship, (2) the evidence supporting the treating physician's opinion, (3) the consistency of the opinion with the record as a whole, (4) whether the opinion is from a specialist, and (5) any other factors brought to light that tend to contradict the treating physician's opinion.

*Foxman*, 157 F. App'x at 346-47 (summary order) (citing 20 C.F.R. § 404.1527(d)(2)).  Here, although the ALJ here did not make explicit how much weight he assigned to Dr. Urban's opinion, the ALJ comprehensively explained the reasons for discounting the treating physician's

opinion by applying the factors set forth in 20 C.F.R. § 404.1527(d)(2).  Among other things, the ALJ considered: (1) the frequency of examination, length, nature and extent of Dr. Urban's treating relationship with Plaintiff by noting that Plaintiff's mental health treatment began at the Metropolitan Center for Mental Health in August 2011 with Dr. Urban who diagnosed Plaintiff with major depressive disorder and prescribed psychotropic medication; (2) the success of Dr. Urban's treatment by considering that in October 2011, Plaintiff reported that she had no complaints about her mental well-being, R. 311-12; and (3) the extent of Plaintiff's treating relationship with Dr. Urban and the clinical findings that supported or contradicted Dr. Urban's opinions.  Indeed, the ALJ considered the contradictions between Dr. Urban's opinions and the record at length.  R. 23 ("the treating psychiatrist's opinions were not borne out by medical record, nor by Dr. Urban's own progress notes.").

Specifically, the ALJ noted that Dr. Urban's opinions contradicted the 54 GAF score she awarded Plaintiff, which indicated "moderate difficulty in social, occupational, or school functioning," not the marked and extreme restrictions identified by Dr. Urban's opinion.  R. 25, 387-88.  Further, the ALJ noted that Dr. Urban's opinion is contradicted by claimant's "self-described activities in the record," which "indicate she is not as functionally limited as alleged... [because] she is fully independent in her self care… [and] performs household chores, including cooking, cleaning and laundry."  R. 24.  The ALJ's finding contradicts Dr. Urban's opinion but is supported by: (1) Dr. Urban's notes reflecting that although Plaintiff has some "periods of symptom exacerbation in the context of psychosocial stressors…, she has been stable throughout the period at issue with medication management and supportive therapy," R. 243, 249, 274, 311; (2) the fact that Plaintiff has never required hospitalization for any of her impairments, R. 23-25; and (3) that Plaintiff reported feeling well more often than not.  R. 229, 243, 249, 270, 297, 305-

07, 311-12.  By considering the above factors, the ALJ adequately explained his reasons for assigning less than controlling weight to the treating physician's opinion.

Plaintiff's argument — that the ALJ erred by failing to accord controlling weight to Plaintiff's treating physician — relies heavily on *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998) wherein the Second Circuit vacated a district court's judgment for rejecting the treating physician's opinion without relying on a contrary medical opinion.  There, the Second Circuit held that an ALJ "is not free to set his own expertise against that of a physician who submitted an opinion to or testified before him" in the absence of a medical opinion to support the ALJ's finding.  142 F.3d at 81 (brackets omitted) (quoting *McBrayer v. Sec'y of HHS*, 712 F.2d 795, 799 (2d Cir. 1983)).  By contrast, here *was* a contrary opinion.  Dr. Kushner's opinion corroborates the essentially normal objective findings in Dr. Urban's treating notes.[19]  Although Dr. Kushner found that Plaintiff had "mildly impaired recent and remote memory skills, … [and] might have difficulty relating adequately with others and appropriately dealing with stress," Dr. Kushner made clear that Plaintiff has the mental capacity to follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn new tasks, make appropriate decisions, and even perform complex tasks with supervisions.  R. 201-04.  A more apt comparison is to *Cichoki v. Astrue*, 34 Fed App'x 71, 74-75 (2d Cir. 2013) (summary order).  There, the Second Circuit found that when a treating physician's opinion conflicts with his own treatment notes an ALJ is

---

[19]     The ALJ's decision to award less than controlling weight to Plaintiff's treating physician's opinion was also supported by findings from Plaintiff's consultative examination. Plaintiff's Consultative Examiner, Dr. Gearhart, opined that Plaintiff only had mild to moderate limitations, including for sitting, standing, and walking, based on generally benign exam findings, including normal gait, the ability to walk on her heels and toes, full strength in her extremities, stable joints, and full range of motion in her ankles knees and shoulders. R. 24.

not required to afford the opinion controlling weight. *Cichocki v. Astrue*, 534 Fed. App'x. 71, 74-75 (2d Cir. 2013) (summary order). In order to properly apply the treating physician rule in this context, the Second Circuit found that the ALJ must comprehensively explain the reasons for discounting the treating physician's opinion. *Id.*

In sum, the ALJ considered the factors set out in 20 C.F.R. § 1527 (d)(2), contrary medical opinions and objective medical findings that supported his decision to award less than controlling weight to Plaintiff's treating physician's opinion. Therefore, the ALJ's decision to award less than controlling weight to the Dr. Urban's opinion is not a basis for remand.[20]

### 2. Combined Effect of Plaintiff's Mental and Physical Impairments

Plaintiff argues that the ALJ erred in failing to consider the combined effect of Plaintiff's physical and mental impairments when determining Plaintiff's residual functional capacity. Pl. Br. at 9-11 (citing 20 C.F.R. 1523, 416.923 ("we will consider the combined effect of all of your impairments")). In particular, Plaintiff argues that the ALJ did not properly consider how Plaintiff's impairments were exacerbated by Plaintiff's obesity. Pl. Br. at 10. Defendant argues that the ALJ considered all of Plaintiff's impairments, including her obesity, before incorporating

---

[20]     Because the ALJ properly analyzed Dr. Urban's opinion and explained his reasons for discrediting her opinion, the ALJ's failure to specify the weight he gave to the opinions is, at most, harmless error. *See Williams v. Comm'r of Soc. Sec.*, No. 14 Civ. 0129, 2015 U.S. Dist. LEXIS 38094, at *18 (N.D.N.Y. Mar. 26, 2015) (ALJ's failure to assign any weight to the treating physician's opinion is "harmless error" "because [the treating physician's] opined limitations are not supported by his own treatment notes or other substantial evidence in the record."); *see also Carway v. Astrue*, No. 06 Civ. 13090, 2010 U.S. Dist. LEXIS 142111, at *36-*37 (S.D.N.Y. Aug. 17, 2010) (ALJ's failure to assign any weight to the treating physician's opinion is "harmless error" where the ALJ referred to the treating physician's report and considered the consistency of other record evidence); and *Pease v. Astrue*, No. 06 Civ. 0264, 2008 U.S. Dist. LEXIS 87269, at *8 (N.D.N.Y. Sept. 17, 2008) (ALJ's failure to comment on the weight of evidence was harmless error because "[t]he ALJ provided a detailed summary and analysis of the reports and records of all treating and examining physicians").

both mental and physical impairments into his residual functional capacity determination.  Def. Opp. at 21 (citing R. 23).

In considering whether a claimant is disabled under the Act, the ALJ must consider the combined effects of all impairments, including impairments that are not severe.  20 C.F.R. §§ 404.1520(e), 404.1545, and 416.945; Social Sec. Reg. 96-8p, 1996 SSR LEXIS 5.  The Second Circuit has found that where an ALJ's opinion indicates that it examined a claimant's ailments in combination, and nothing suggests otherwise, there is no reason to believe that the ALJ failed to do so.  *See Rivers v. Astrue*, 280 F. App'x 20, 23 (2d Cir. 2008) (summary order).

Not only is there nothing to suggest that the ALJ did not consider Plaintiff's impairments in combination, the ALJ's analysis makes clear that he did consider the combined effect of Plaintiff's physical and mental impairments.  The ALJ specifically noted that the determination was made after "considering *all* symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence…" R. 20 (emphasis added).  Similarly, the ALJ discussed both Plaintiff's physical and mental impairments finding that "[t]he record substantiates that the claimant has diabetes mellitus, type II, and peripheral neuropathy, as well as hypertension and hyperlipidemia.  She also received mental health treatment for depressive and anxiety disorders." R. 20.

Contrary to Plaintiff's assertion, the ALJ's residual functional capacity determination that Plaintiff could perform light work "except she is restricted to work involving simple repetitive and routine tasks, and no more than occasional interaction with the public" acknowledges both Plaintiff's physical and mental impairments. R. 20.  Plaintiff's limitations caused by her diabetes, obesity and peripheral neuropathy are reflected in the ALJ's residual functional determination that Plaintiff can perform light work "restricted to work involving simple

32

repetitive and routine tasks." R. 20. Plaintiff's limitations caused by her depressive and anxiety disorders are reflected in the ALJ's decision to limit Plaintiff to "no more than occasional interaction with the public." R. 20.

After evaluating Plaintiff's mental and physical impairments in tandem, the ALJ "accommodated her proven mental limitations by restricting her to simple repetitive tasks and only occasional interaction with the public" and made clear that "[t]his residual functional capacity finding accommodates Plaintiff's physical *and* mental limitations, from all of her impairments, and no further restrictions are indicated." R. 24 (emphasis added). At the end of the ALJ's decision, the ALJ again considered the combination of Plaintiff's physical and mental impairments explaining that "[u]nskilled jobs ordinarily involve dealing primarily with objects rather than with data or people, and they generally provide substantial vocational opportunity for person with mental impairments who retain the capacity to meet the intellectual and emotional demands of such jobs on a sustained basis," noting that this is particularly appropriate in Plaintiff's case because "she does not have a substantial loss of ability to perform the basic mental tasks associated with unskilled work." R. 26.

Thus, nothing in the ALJ's decision suggests that the ALJ did not consider the combined effect of Plaintiff's mental and physical impairments. The simple fact that the ALJ sorted Plaintiff's impairments into separate, manageable categories for purposes of analysis does not show that the ALJ considered Plaintiff's individual impairments only in isolation.

Plaintiff's argument that the ALJ "erred because he did not properly evaluate Plaintiff's obesity ... and failed to explain how he reached his conclusion on whether obesity caused any physical or mental limitations" is similarly without merit. Pl. Br. at 10-11. Obesity is a medically determinable impairment to be considered in evaluating a Plaintiff's residual

functional capacity.  Social Security Ruling 02-01p, 2002 SSR LEXIS 1, at *16 (Sept. 12, 2002).

"This does not mean, however, that an ALJ must always explicitly discuss a claimant's obesity

in his or her [residual functional capacity] determination; rather, an ALJ's determination can

reflect an appropriate consideration of obesity if it adopts the limitations suggested by physicians

who have directly considered the effects of obesity in their opinions." *Wilson v. Colvin*, 14 Civ.

5666, 2015 U.S. Dist. LEXIS 135651, at *102-04 (S.D.N.Y. Sept. 29, 2015); *Paulino v. Astrue*,

No. 08 Civ. 02813, 2010 U.S. Dist. LEXIS 77070, at *19 (S.D.N.Y. July 30, 2010) (report and

recommendation adopted Aug. 20, 2010) (holding that the ALJ "properly considered the effects

of [Plaintiff's] obesity by adopting treating physicians' and consultative physicians' opinions,

which specifically accounted for [Plaintiff's] obesity when determining her capacity for work");

*see also* Soc. Sec. Reg. 02-01p, 2002 SSR LEXIS 1, *9 ("[w]hen the evidence in a case does not

include a diagnosis of obesity, but does include clinical notes or other medical records showing

consistently high body weight or BMI ... in most such cases we will use our judgment to

establish the presence of obesity based on medical findings and other evidence in the case

record").  Here, the ALJ's decision both explicitly and implicitly considered Plaintiff's obesity

and found that it did not prevent her from doing as prescribed in his decision.  R. 24.  The ALJ

explicitly considered Plaintiff's obesity when he wrote, "I have considered claimant's weight

(she stands at 58" tall and weighs 180 pounds) and do not find that she has additional functional

limitations from obesity beyond those that are accommodated in this residual function finding."

R. 24.  The ALJ implicitly considered Plaintiff's obesity by adopting Dr. Fiebach's objective

findings.  Dr. Fiebach's treating notes reported Plaintiff's weight, relative to her height and

consistently indicated that Plaintiff had a high BMI, *see* R. at 262, 270, 277, 291, which, under

Soc. Sec. Reg., 02-01p, is considered within the range of "obese."  Although the ALJ gave

34

"limited" weight to Dr. Fiebach's November 2012 statement that the claimant is "partially disabled," finding this statement was conclusory and failed to describe specific functional limitations, the ALJ confirmed that his residual functional capacity determination was "fully consonant with the objective findings in Dr. Fiebach's treating records." R. 24, 200.

The ALJ plainly took note of Dr. Fiebach's clinical findings and determined, based on Dr. Fiebach's records that Plaintiff had some limitations caused by her obesity. Accordingly, I find that the ALJ explicitly and implicitly considered Plaintiff's obesity in making his residual functional capacity evaluation.

The record shows that ALJ properly considered the combination of Plaintiff's physical and mental impairments, including obesity, when making his residual functional capacity determination. There is no reason to remand on this basis.

### 3. Credibility

Plaintiff argues that the ALJ erred by failing to credit Plaintiff's testimony about the side effects of her medications because Plaintiff testified to known side effects of her medications and therefore must have experienced those side effects. Pl. Br. at 11. Defendant contends that the ALJ did not err because "[a]lthough Plaintiff testified to nausea, stomach pain, and dizziness so severe it prevented her from travelling alone," R. 37-39, there is no mention of such side effects in her medical records. Def. Opp. at 19. The Court rejects Plaintiff's circular argument and finds that the ALJ properly rejected Plaintiff's testimony about the side effects of her medication because it was wholly unsupported by the record.

In assessing plaintiff's subjective claims of pain and other symptoms, the ALJ must determine that there are "medical signs and laboratory findings which show that [plaintiff has] a medical impairment which could reasonably be expected to produce the pain." *Snell v. Apfel*,

177 F.3d 128, 135 (2d. Cir. 1999). Assuming these exist, the ALJ must then assess plaintiff's complaints, considering the following factors: (1) daily activities; (2) the location, duration, frequency, and intensity of the pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, received for relief of pain or other symptoms; (6) any measures used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 416.929(c)(3). If after considering these factors the ALJ's findings "are supported by substantial evidence… the court must uphold the ALJ's decision to discount plaintiff's subjective complaints of pain." *Aponte v. Sec'y, Dep't of Health and Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984).

The ALJ here considered the credibility factors in making this credibility determination, i.e., (1) Plaintiff's treatment with medication, dietary control, and therapy, which were effective when she was compliant, (2) aggravating factors such as her psychosocial stressors, including financial and personal concerns, and (3) the lack of hospitalizations due to her impairments. R. 23-24. In particular, the ALJ focused on the progress notes, which did not "corroborate claimant's testimony that her medications cause side effects dizziness, nausea, stomach pain, and tiredness," and the dearth of "evidence of complaints of persistent side effects in any of her medical records." R. 23-24.

Ultimately, the ALJ found that Plaintiff's testimony about the side effects of her medication was unsupported by the record because "[t]here is no evidence of complaints of persistent side effects in any of the CPMC records, and Dr. Urban expressly stated that Plaintiff

does not have side effects from psychotropic medications." R. 23-24 (citing R. 213-18, 219-24, 385).

Since there were no medical findings that support Plaintiff's testimony about the side effects of her medications, the ALJ justifiably rejected Plaintiff's testimony. In light of the foregoing, the ALJ's credibility determination was supported by substantial evidence and I recommend that the Court decline to disturb the ALJ's credibility finding on this record.

**B. Vocation Expert Testimony**

Plaintiff asserts that the ALJ erred by failing to obtain vocational expert testimony to analyze the impact of Plaintiff's non-exertional limitations — her major depressive disorder and difficulty performing manipulative functions — on her residual functional capacity. Pl. Br. at 12-13. Defendant contends that the ALJ "properly applied the Grids after explaining that Plaintiff's non-exertional limitations did not significantly erode the occupational base of unskilled, light work because unskilled work typically involved simple tasks and limited interactions with others." Def. Opp. at 24.

"In the ordinary case," the Commissioner meets his burden at the fifth step "by resorting to the applicable medical vocational guidelines (the grids), 20 C.F.R. Pt. 404, Subpt. P, App. 2 (1986)." *Bapp*, 802 F.2d 601, 604 (2d Cir. 1986). The Grids "take[] into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience." *Zorilla v. Chater*, 915 F. Supp. 662, 667 (S.D.N.Y. 1996). Based on these considerations, the grids indicate whether the claimant can engage in any substantial gainful work existing in the national economy. The Second Circuit has held, however, that an "ALJ cannot rely on the Grids if a non-exertional impairment has any more than a 'negligible' impact on a claimant's ability to perform the full range of work, and instead must obtain the testimony

of a vocational expert." *Selian v. Astrue*, 708 F.3d 409, 421 (2d Cir. 2013) (quoting *Zabala v. Astrue*, 595 F.3d 402, 411 (2d Cir. 2010)).

The holding in *Vargas v. Astrue*, No. 10 Civ. 6306, 2011 U.S. Dist. LEXIS 78819 (S.D.N.Y. July 20, 2011) is instructive. There, the court found that an ALJ's decision to apply the Grids without vocation expert testimony was appropriate because the Plaintiff's nonexertional limitations "did not significantly limit her ability to carry out unskilled light work." Def. Opp. at 24 (citing *Vargas v. Astrue* at *39-40.). Similarly, the ALJ here noted that Plaintiff's nonexertional limitations would have "little or no effect on the occupational base of unskilled work." R. 25-26. Furthermore, the ALJ explained that his residual functional capacity determination took into account any negligible impact her nonexertional limitations might have on her ability to work, "Unskilled jobs ordinarily involve dealing primarily with objects rather than with data or people, and they generally provide substantial vocational opportunity for person with mental impairments who retain the capacity to meet the intellectual and emotional demands of such jobs on a sustained basis." R. 26.

Thus, the ALJ affirmatively determined that Plaintiff's nonexertional impairments were negligible. The ALJ's decision to rely exclusively on the Grids was, therefore, appropriate.

### C. Language Abilities

Plaintiff argues that the ALJ erred by finding that Plaintiff was able to communicate in English because she would have been found disabled under the Grids *if she were limited to sedentary work.* Pl. Br. at 14. Defendant contends that "any error in finding Plaintiff could communicate in English was harmless" because the Grids directed a finding of non-disability despite her lack of English fluency. Def. Opp. at 25 (citing R. 23, 25-26).

It is true that Plaintiff testified at the hearing with the assistance of a Spanish speaking interpreter. R. 32. It is also true that Plaintiff's Disability Report – Adult Form SSA-3368 stated

that she cannot speak, read, write or understand English. R. 148. Since there was no evidence in the record that Plaintiff has the ability to communicate in English, the ALJ's finding that Plaintiff could communicate in English was error.[21]

However, Plaintiff's citation to Section 201.00(h) of the Medical-Vocational Guidelines, 20 C.F.R. Pt. 404, Subpt. P. App. 2 ("Rule 201.00(h)") is misleading. Rule 201.00(h) compels "a finding of 'disabled' only for the individuals age 45-49 who: (i) Are restricted to sedentary work, (ii) Are unskilled or have no transferable skills, (iii) Have no past relevant work or can no longer perform past relevant work, and (iv) Are unable to communicate in English, or are able to speak and understand English but are unable to read or write in English." Here, the ALJ did *not* find that Plaintiff was limited to sedentary work. Rather, the ALJ found that Plaintiff could perform a wide range of *light work*, which rendered her non-disabled under the Grids whether or not she was able to communicate in English under either Rule 202.16 or 202.20. R. 23, 25-26. *Compare* 20 C.F.R. Part 404, Subpart P, App. 2, Medical-Vocational Rule 202.20, *with* Medical-Vocational Rule 202.16. Rule 202(g) actually considers the impact a lack of English fluency may have on an "individual's vocational scope," but concludes that "the primary work functions in the bulk of unskilled work relate to working with things (rather than with data or people) and in these work functions at the unskilled level, literacy or ability to communicate in English has the least significance." Plaintiff fails to make any other arguments in support of her contention that "the ALJ erred when he found that Plaintiff can communicate in English." Pl. Br. at 14.

Accordingly, Plaintiff's English fluency or lack thereof does not impact the disability

---

[21]     This analysis assumes *arguendo* that the statement in the ALJ's decision that Plaintiff "is able to communicate in English" was not simply a typographical error. R. 25. Notably, in the narrative of the ALJ's decision, the ALJ recognized that Plaintiff testified with the assistance of a Spanish Language interpreter. R. 16.

determination on this record.  Any error in finding Plaintiff could communicate in English was therefore harmless.

### VI.    CONCLUSION

For the reasons set forth below, I respectfully recommend that Defendant's cross-motion be **GRANTED**, and that Plaintiff's motion be **DENIED**.

Dated: January 30, 2017
White Plains, New York

Respectfully submitted,

Paul E. Davison, U.S.M.J.

### NOTICE

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to serve and file written objections.  *See also* FED. R. CIV. P. 6(a).  Such objections, if any, along with any responses to the objections, shall be filed with the Clerk of the Court with extra copies delivered to the chambers of the Honorable Cathy Seibel, at the Honorable Charles L. Brieant, Jr. Federal Building and United States Courthouse, 300 Quarropas Street, White Plains, New York 10601, and to the chambers of the undersigned at the same address.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.

Requests for extensions of time to file objections must be made to Judge Seibel.

40